RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BARBARA RAMSEY,

                *Plaintiff-Appellant,*

    *v.*

PENN MUTUAL LIFE INSURANCE COMPANY,

                *Defendant-Appellee.*

No. 14-3869

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:12-cv-01738—William H. Baughman, Jr., Magistrate Judge.

Argued: April 29, 2015

Decided and Filed: June 1, 2015

Before: CLAY, KETHLEDGE, and DONALD, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Joseph William Diemert, Jr., DIEMERT & ASSOCIATES CO., L.P.A., Cleveland, Ohio, for Appellant. Jeffrey D. Fincun, WESTON HURD LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Joseph William Diemert, Jr., Daniel A. Powell, DIEMERT & ASSOCIATES CO., L.P.A., Cleveland, Ohio, for Appellant. Jeffrey D. Fincun, Karen A. Davey, Shawn W. Maestle, WESTON HURD LLP, Cleveland, Ohio, for Appellee.

_____

### OPINION

_____

BERNICE BOUIE DONALD, Circuit Judge. In this case, Defendant-Appellee Penn Mutual Life Insurance Company ("Penn Mutual") refused to pay death benefits to Plaintiff-Appellant Barbara Ramsey ("Plaintiff") upon the death of her husband, John Ramsey

("Mr. Ramsey"). The district court concluded that Mr. Ramsey had failed to inform Penn Mutual of a change in the status of his health prior to the delivery of his life-insurance policy, thereby breaching a representation in the contract and permitting Penn Mutual to deny payment of benefits. *Ramsey v. Penn Mut. Life Ins. Co.*, 36 F. Supp. 3d 761, 770-71 (N.D. Ohio 2014). On that basis, the district court granted summary judgment to Penn Mutual. *Id.* at 773. We **REVERSE**.

I.

A.

The parties have stipulated to the following facts. On February 10, 2010, Mr. Ramsey applied for $2 million in life insurance from Penn Mutual. The application consisted of two parts. Part I, completed and signed by Mr. Ramsey, indicated that he was a firefighter for the City of Cleveland for sixteen years, that his wife was his primary beneficiary, and that he had last seen his personal physician for a checkup in February 2006. Part I also contained the following representation:

> I[ ], the Proposed Insured[ ], . . . represent that the statements and answers in this part I of the application are written as made by me[ ] and are complete and true to the best of my [ ] knowledge and belief. I[,] the Proposed Insured[ ], . . . agree that they will be a part of the contract of insurance if issued; that I[ ] will be bound by such statements and answers, and that [Penn Mutual], believing them to be true, will rely and act upon them. I[ ] also understand and agree that:
>
> 1. Subject to the provisions of the temporary insurance agreement attached to this application, no insurance will be in force until the first premium is paid in full and the policy is delivered while the health, habits, occupation and other facts relating to the Proposed Insured[ ] . . . are the same as described in this Part I of the application, any Part II required by [Penn Mutual] and any amendments or supplements to them.

Part II of the application, entitled "Medical Examiner's Report," involved a medical examination of Mr. Ramsey at his home by a licensed professional nurse. The Medical Examiner's Report contained a series of medical history questions. As relevant to this appeal, question 2(e) of the application asked whether Mr. Ramsey had "ever been treated for or had any indicator of . . . [j]aundice, intestinal bleeding, ulcer, hernia, colitis, recurrent indigestion or other disorder of the stomach, intestines, liver or gall bladder?" Mr. Ramsey disclosed that he suffered

from chronic ulcerative colitis, providing the following explanatory details: "1984. COLITIS. COLON – INTESTINAL RESECTION[.] HOSPITAL X 4 DAYS. FULL RECOVERY 6 MOS. IAN LAVERY . . . LAST SEEN 2006. BX DONE. NORMAL FINDINGS[.]" Penn Mutual's underwriting guidelines define ulcerative colitis as "[a]n inflammatory disease of the mucosa of the large bowel," with symptoms including "[r]ectal bleeding, diarrhea, cramping, abdominal pain, anorexia and weight loss . . . ." Since at least 1981, Mr. Ramsey had suffered from chronic ulcerative colitis, which "occurs in a minority of patients." In 1984, Dr. Ian Lavery—a colorectal surgeon at the Cleveland Clinic—surgically removed Mr. Ramsey's colon in order to alleviate his colitis symptoms. According to Penn Mutual's underwriting guidelines, that procedure—called a "resection"—"is now rarely performed as persistent or recurrent symptoms almost invariably occur, and there is a risk of cancer developing in the rectal stump."

As with Part I, Mr. Ramsey signed Part II of the application, which contained the following representation:

> I represent that the statements and answers in this Part II are written as made by me and are full, complete and true to the best of my knowledge and belief. I agree that they will be a part of the contract of insurance if issued, that I will be bound by such statements and answers, and that Penn Mutual . . . , believing them to be true, will rely and act upon them.

Penn Mutual then proceeded with its underwriting process. On February 19, 2010, one of Penn Mutual's underwriters determined that, based on Mr. Ramsey's disclosures in question 2(e), Penn Mutual could not immediately approve his application. With Mr. Ramsey's authorization, Penn Mutual obtained various medical records, including biopsy reports prepared by Dr. Lavery in 2001 and 2004 that indicated the presence of chronic ulcerative colitis. In mid-April 2010, based on Mr. Ramsey's history of ulcerative colitis, Penn Mutual offered him a $2 million policy with a "Table 2" rating, which is one of the lowest ratings Penn Mutual offers and which entails an above-average premium.

On April 28, 2010, Dr. Lavery examined Mr. Ramsey at the Cleveland Clinic. Dr. Lavery's notes indicated that Mr. Ramsey suffered from ulcerative colitis "for 20+ yrs but has had no treatment for 10-12 yrs," and that his April 28 visit was precipitated by "frequent bloody [bowel movements] and feel[ing] bad." Dr. Lavery prescribed several medications in

order to ease Mr. Ramsey's symptoms. On May 17, 2010, Mr. Ramsey visited Dr. Lavery for a follow-up examination. Dr. Lavery's notes indicated that Mr. Ramsey's medications had brought about "some improvement in his symptoms," but that he was "still having 15+ loose stools a day."

On June 1, 2010, Penn Mutual drafted and Mr. Ramsey signed two amendments to his application. The amendments changed the value of Mr. Ramsey's term-life policy to $500,000; added a whole-life policy of $400,000; and added a $150,000 "Benefit Increase Rider." The June 1 amendments also altered Mr. Ramsey's answer to question 2(e) as follows:

> Have you ever been treated for or had any indication of: Jaundice, intestinal bleeding, ulcer, hernia, colitis, recurrent indigestion or other disorder of the stomach, intestines, liver or gall bladder? Yes, I had a colon resection in 1984 due to colitis. My last colonoscopy was in 2004. I have not had a colon[o]scopy since 2004 and have had no gastrointestinal problems since that time.

On June 16, 2010, Mr. Ramsey visited Dr. Roop Kaw for an examination in anticipation of a proctectomy[1] by Dr. Lavery scheduled for June 24, 2010. Dr. Kaw's notes indicated that "[t]he condition requiring this surgery" was "[d]iarrhea and rectal bleeding [for] 5 months," and Dr. Lavery testified that the surgery was not exploratory and was intended only to relieve Mr. Ramsey's colitis symptoms. However, during the surgery on June 24, 2010, Dr. Lavery discovered peritoneal seeding in Mr. Ramsey's pelvis, which Dr. Lavery determined was "a carcinoma that had probably come from the rectum." Dr. Lavery aborted the proctectomy procedure after determining "that to proceed was inappropriate as [Mr. Ramsey] would need chemoradiotherapy for the rectal tumor."

Mr. Ramsey was diagnosed with stage IV metastatic rectal cancer, which his doctors determined was incurable. He died on September 20, 2011, due to complications from that cancer.

---

[1]A proctectomy is a procedure to remove the rectum.

Plaintiff submitted an application for death benefits to Penn Mutual on September 21, 2011.**2**   On February 27, 2012, Penn Mutual denied Plaintiff's application for benefits. Specifically, Penn Mutual stated:

> Mr. Ramsey knew of his treatments between the time of application and the delivery of the policies, and knew that they rendered untrue the statement in the application that he "had no gastrointestinal problems since (2004)."  The records from Dr. Lavery, of the Cleveland Clinic, indicated that Mr. Ramsey was clearly having gastrointestinal problems between the time of application and the delivery of the policies.

> Because Mr. Ramsey's health was not the same at delivery as described in the application signed on February 10, 2010, or the application amendment signed on June 1, 2010, the condition precedent requiring it to be the same prevents insurance from being in force under the policies.  Also, based on the misrepresentations in the application, which Mr. Ramsey had a continuing obligation to correct, and the misrepresentations in the application amendment, Penn Mutual rescinds the policies pursuant to Ohio Rev[.] Code Section 3911.06 by returning premiums.

Penn Mutual returned $14,761.45 in premiums to Plaintiff.

B.

On June 6, 2012, Plaintiff filed suit against Penn Mutual in the Court of Common Pleas for Cuyahoga County, Ohio.  The complaint alleged breach of contract and sought compensatory and punitive damages.  Penn Mutual removed the action to the United States District Court for the Northern District of Ohio.  Pursuant to 28 U.S.C. § 636(c)(1), the parties consented to having their case adjudicated by a magistrate judge.

On May 3, 2013, the parties filed cross-motions for summary judgment.  The district court heard oral arguments on the motions on July 15, 2013.  On August 7, 2014, the district court granted Penn Mutual's motion for summary judgment and denied Plaintiff's motion for summary judgment. *Ramsey*, 36 F. Supp. 3d at 773.  The court entered judgment that same day, declaring "that plaintiff Ramsey take nothing and that the action be dismissed on the merits." Plaintiff timely appealed.

---

**2**The parties do not dispute that Mr. Ramsey was current on his premium payments to Penn Mutual up through the time of his death.

II.

We review a district court order granting summary judgment de novo. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court reviewing a summary judgment motion must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issues are "whether the evidence—viewed in the light most favorable to the nonmoving party—presents a sufficient disagreement to require submission to the fact-finder, or whether the evidence is so one-sided that the moving party must prevail as a matter of law." *Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013).

III.

We must first address Penn Mutual's argument that we lack jurisdiction. *Metro Hydroelec. Co. v. Metro Parks*, 541 F.3d 605, 610 (6th Cir. 2008). We then proceed to the merits of the appeal.

A.

As an initial matter, Penn Mutual challenges Plaintiff's notice of appeal as defective. The notice referenced only the magistrate judge's order granting summary judgment to Penn Mutual, but failed to mention the court's accompanying judgment—entered the very same day—disposing of the case. According to Penn Mutual, this failure deprives us of jurisdiction because Federal Rule of Appellate Procedure 3(c)(1)(B) requires that a notice of appeal "designate the judgment, order, or part thereof being appealed." We disagree.

It is true that we have held that Rule 3(c)(1)(B)'s requirements are "mandatory and [ ] jurisdictional," requiring "strict obedience" even in the face of "harsh results." *United States v. Glover*, 242 F.3d 333, 335 (6th Cir. 2001). But "[a] mistake in designating the judgment appealed from is not always fatal, so long as the intent to appeal from a specific ruling can fairly be inferred by probing the notice and the other party was not misled or prejudiced." *Sanabria v. United States*, 437 U.S. 54, 67 n.21 (1978); *see also Caudill v. Hollan*, 431 F.3d 900, 907

(6th Cir. 2005) (noting that Rule 3(c)(1)'s requirements "should be liberally construed and applied"). Penn Mutual has not noted any serious confusion as to which ruling of the district court Plaintiff intended to appeal. That is because it is obvious: her notice of appeal specifically references an order that entered summary judgment in Penn Mutual's favor. *See Caudill*, 431 F.3d at 905 ("An appeal referencing an order that directs entry of judgment in a case is a sufficient equivalent to appealing the judgment itself, even though the judgment is entered as a separate document."). Nor has Penn Mutual identified any prejudice that would result from our consideration of this appeal, which both parties have briefed and argued fully. Because the imperfection in Plaintiff's notice of appeal leaves "no genuine doubt . . . about who is appealing, from what judgment, [and] to which appellate court," *Becker v. Montgomery*, 532 U.S. 757, 767 (2001), we have jurisdiction to consider her appeal.

B.

As for the merits of Plaintiff's appeal, Penn Mutual argues that Mr. Ramsey's failure to disclose his rectal bleeding and doctor visits in 2010 renders his "representation or warranty"[3] that he had suffered no gastrointestinal problems since 2004 false, and in turn operates as a complete defense to liability under the terms of the policy. Construing all reasonable inferences in Plaintiff's favor, we disagree.

As an initial matter, the district court's reasoning—finding that Mr. Ramsey's failure to mention his April and May 2010 doctor visits was inconsistent with his representation that he was "last seen" by Dr. Lavery in 2006—was erroneous. *Ramsey*, 36 F. Supp. 3d at 771. The district court held that Mr. Ramsey's "February 10, 2010, statement that he had last seen Dr. Lavery in 2006 . . . ceased to be accurate as of April 28, 2010, when [Mr.] Ramsey was seen by Dr. Lavery, and when he again saw Dr. Lavery on May 17, 2010." *Id.* The district court's analysis proceeded as follows:

---

[3]Penn Mutual does not distinguish between representations or warranties, but the two are not interchangeable. A breach of warranty renders a policy void ab initio, while a misrepresentation merely renders a policy voidable. *Allstate Ins. Co. v. Boggs*, 271 N.E.2d 855, 858 (Ohio 1971). Ohio courts disfavor warranties and will not interpret contract language as such unless the language, "construed strictly against the insurer, requires such an interpretation." *Id.* Mr. Ramsey's policy unequivocally provides that "[a]ll statements made in the application for this policy are representations and not warranties." Accordingly, Mr. Ramsey's allegedly false answer to question 2(e) is a representation and not a warranty.

While [Mr.] Ramsey argues that his condition was a chronic condition, with regularly occurring symptoms, such that the 2010 visits to Dr. Lavery were "nothing new," the record is clear that [Mr.] Ramsey had represented to Penn Mutual in February 2010 that however frequently his symptoms occurred, or however severe those symptoms were, the symptoms had not been severe enough for him to contact Dr. Lavery for approximately four years. The fact that within the span of less than a month of making that representation [Mr.] Ramsey twice sought treatment from Dr. Lavery for the first time in four years is manifestly something new, and something [Mr.] Ramsey was obligated to report to Penn Mutual.

*Id.* (footnote omitted).

This analysis is problematic for two reasons. First, Mr. Ramsey amended his original answer to question 2(e), dated February 10, 2010, which contained the statement that he had "last seen" Dr. Lavery in 2006. In his June 1, 2010, amendment, Mr. Ramsey changed his answer to reflect that he had not had a colonoscopy since 2004. The June 1 amendment, which "[became] a part of the representation contained in [Mr. Ramsey's] application and [became] subject to the agreements contained therein," took the place of the February 10 answer.[4] *See Amend*, Black's Law Dictionary (10th ed. 2014) ("[T]o formally alter . . . by striking out, inserting, or *substituting* words." (emphasis added)). In that sense, the district court's focus on the "last seen" language in the February 10 answer to question 2(e) misses the mark.

Second, even assuming, as the district court did, that the February 10 answer remains relevant, the district court's analysis fails to construe all reasonable inferences in Plaintiff's favor—as the district court must on summary judgment. For example, the district court inferred from the "last seen [in] 2006" answer that Mr. Ramsey's "symptoms had not been severe enough for him to contact Dr. Lavery for approximately four years." *Ramsey*, 36 F. Supp. 3d at 771. That is not necessarily true; as his medical records indicate, Mr. Ramsey visited the doctor regarding his colitis once every few years—in 1996, in 2001, in 2004, and in 2010. Moreover, as Mr. Ramsey's family indicated in affidavits, he "consistently and regularly experienced" colitis symptoms, "rarely discussed the specifics of his symptoms," "was not a 'complainer[,]' and had an abnormally high tolerance for pain/discomfort." Therefore, it is fair to infer—and a jury could reasonably conclude—that Mr. Ramsey's "last seen [in] 2006" answer and subsequent

---

[4]While the amendment indicates that "[t]he signed original is to remain attached to the policy," it does not suggest that the original answer to question 2(e)—altered by the amendment—retains its binding effect.

doctor visits in 2010 connote nothing as to the ongoing severity or non-severity of his colitis symptoms.

It is also fair to infer that Mr. Ramsey's June 1, 2010, statement that he had suffered no gastrointestinal problems since his last colonoscopy in 2004 was not a misrepresentation as to the state of his health.  Penn Mutual knew that Mr. Ramsey suffered from chronic ulcerative colitis, which its own underwriting guidelines define as a disease "characterized by attacks of bloody diarrhea punctuated by periods of remission."  Because Mr. Ramsey was up front with Penn Mutual about this condition, there is at least a genuine issue of material fact as to whether his rectal bleeding in 2010 was simply par for the course, or was, as the district court stated, "manifestly something new."  *Id.*; *see also Glatt v. Union Cent. Life Ins. Co.*, No. 92 CIV. 1227., 1994 WL 329985, at *6-7 (S.D.N.Y. July 11, 1994) (denying summary judgment where there were "questions of fact as to whether [the decedent's chest] pains radiated from his chronic shoulder condition, a condition disclosed on the Application, or rather, from heart or pulmonary problems").  Indeed, there is no evidence in the record that either Mr. Ramsey or his doctors knew that he had cancer prior to the delivery of his policy.  To the contrary, Dr. Lavery testified that rectal cancer "causes exactly the same symptoms that colitis does."

Further, Penn Mutual knew about—and accounted for—this risk.  Again, its underwriting guidelines note that Mr. Ramsey's colon resection procedure "is now rarely performed as *persistent or recurrent symptoms almost invariably occur, and there is a risk of cancer developing in the rectal stump.*"  Penn Mutual was aware not only of Mr. Ramsey's chronic condition and all of its attendant symptoms, but also of a prior surgical procedure that increased his risk of cancer.  It accordingly charged him a higher premium and rated him at one of the lowest ratings offered by the company.  Taken in the light most favorable to Plaintiff, all of this evidence adds up to a genuine dispute as to whether the state of Mr. Ramsey's health at the time of the delivery of his policy was the same as described in his application.

Moreover, even if we found no genuine dispute that Mr. Ramsey's answer to question 2(e) was a false representation regarding the state of his health, Ohio law dictates that while such a misrepresentation renders the policy voidable at the insurer's option, it "may not be used to avoid liability arising under the policy after such liability has been incurred."  *James v.*

*Safeco Ins. Co. of Ill.*, 959 N.E.2d 599, 602 (Ohio Ct. App. 2011) (quoting *Boggs*, 271 N.E.2d at 857) (internal quotation marks omitted).  Penn Mutual incurred liability to pay death benefits under the policy prior to cancelling it based on Mr. Ramsey's alleged misrepresentations.  As such, Penn Mutual cannot now rely on said misrepresentations as a defense to liability.

Finally, for the reasons stated above, Penn Mutual's argument that Mr. Ramsey's policy is voidable under Ohio Rev. Code § 3911.06 based on his allegedly false answer to question 2(e) also fails.  That section provides:

> No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer.

Ohio Rev. Code § 3911.06.  Under § 3911.06, an insurer may use an answer to an application question as a bar to recovery if it can clearly prove that:  "(1) the applicant willfully gave a false answer[,] (2) such answer was made fraudulently[,] (3) but for such answer the policy would not have been issued[,] and (4) neither the insurer nor its agent had any knowledge of the falsity of such answer."  *Jenkins v. Metro. Life Ins. Co.*, 173 N.E.2d 122, 125 (Ohio 1961).  The statute requires an insurer to show only "that the applicant knowingly provided a false answer," not necessarily fraudulent intent.  *Johnson v. Conn. Gen. Life Ins. Co.*, 324 F. App'x 459, 467 (6th Cir. 2009).  But § 3911.06 is not appropriate as a defense where, as here, there is "evidence that the insured made an honest mistake."  *Id.*  As noted above, a jury could reasonably conclude on this record that Ramsey honestly believed that he had fully disclosed his medical conditions.

For these reasons, summary judgment for Penn Mutual based on Mr. Ramsey's answer to question 2(e) was inappropriate.

C.

Penn Mutual asserts numerous alternative grounds in support of the district court's grant of summary judgment.  First, Penn Mutual argues that Mr. Ramsey's life-insurance policy never came into force because the "same [health] as described" provision was a condition precedent to

the formation of the contract, as made plain by the language indicating that "no insurance will be in force" otherwise. As we have already noted, there is a genuine issue of material fact as to whether Mr. Ramsey's health remained the same as described in the application. However, even if we held otherwise, the district court properly rejected Penn Mutual's argument that the policy's "same [health] as described" provision was a condition precedent. *See Ramsey*, 36 F. Supp. 3d at 768.

Ohio law "disfavors conditions precedent." *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 965 N.E.2d 1007, 1013 (Ohio Ct. App. 2011). "Consequently, absent an explicit intent to establish a condition precedent, courts will not interpret a contractual provision in that manner . . . ." *Id.* at 1014. Ohio law defines a condition precedent as "one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of some act, . . . before the contract shall be binding on the parties." *Mumaw v. W. & S. Life Ins. Co.*, 119 N.E. 132, 135 (Ohio 1917); *see also Ohio Nat'l Life Assurance Corp. v. Satterfield*, 956 N.E.2d 866, 870 (Ohio Ct. App. 2011) ("A condition precedent is an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises." (internal quotation marks omitted)). Provisions that merely require that a "state of facts . . . remain[ ] true" are not conditions precedent. *Satterfield*, 956 N.E.2d at 871. Ohio courts have interpreted language virtually identical to the relevant language in this case and have determined that "no material change" clauses are not conditions precedent.[5] *See, e.g.*, *id.* Hence, a change in Mr. Ramsey's health as described in the application prior to delivery of the policy would render his contract *voidable*, not void ab initio. *Id.* at 873.

Nevertheless, Penn Mutual asserts that two decisions—*Abella v. Jackson National Life Insurance Co.*, No. 97-3498, 1998 WL 708706 (6th Cir. Oct. 1, 1998) (unpublished), and *Langley v. Federal Kemper Life Assurance Co.*, No. 01AP-129, 2001 WL 1143019 (Ohio Ct. App. Sept. 28, 2001) (unpublished)—require the conclusion that this provision was a condition precedent and that the alleged change in Mr. Ramsey's health vitiated the contract. The district

---

[5]This Court—sitting in diversity—must apply Ohio law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938); *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997).

court relied on these cases in granting summary judgment to Penn Mutual. *Ramsey*, 36 F. Supp. 3d at 769. But neither case squarely applies here.

In *Abella*, the relevant insurance policy contained a provision stating, "I understand that if my health or any of my answers or statements change prior to delivery of the policy, I must so inform the Company in writing." 1998 WL 708706, at *1. Assuming without deciding that this provision was a condition precedent, *see id.* at *4-5 & n.3, we held that the insured—who had experienced chest pains prior to the delivery of his policy—had breached the condition. *Id.* at *5. By contrast, there is no provision in Mr. Ramsey's policy setting forth an affirmative duty to inform Penn Mutual of any changes in his health. *See id.* (noting that courts should not read into the language of a policy a clause that is not present in the policy as written). Accordingly, *Abella* does not dictate summary judgment in Penn Mutual's favor.

Similarly, in *Langley*, the relevant policy contained an affirmative "promise to tell the Company of any change in the health or habits of the Proposed Insured that occurs after completing this application." 2001 WL 1143019, at *3. Based on this provision, the court held that the company could deny death benefits where the decedent failed to disclose that he had been coughing up blood "between his application for life insurance and the date the life insurance was to take effect." *Id.* at *4. Again, no such affirmative duty appears in Mr. Ramsey's policy. Furthermore, to the extent *Langley* considered language requiring "the health and habits of the Proposed Insured [to] remain as stated in [the] application" to be a condition precedent, *see id.*, the district court should not have relied on it. *See Kurczi*, 113 F.3d at 1429 (noting that federal courts should not apply decisions of intermediate state courts that incorrectly reflect state law). As the Ohio Supreme Court held in *Mumaw*, such a provision is not a condition precedent. 119 N.E. at 135-36.

For the foregoing reasons, we reject Penn Mutual's argument that Mr. Ramsey breached a condition precedent to the formation of the contract.

D.

Finally, Penn Mutual argues that Mr. Ramsey breached his common-law duty of good faith to disclose a material deterioration in his health prior to the delivery of his policy.

Penn Mutual relies on the Supreme Court's statements in *Stipcich v. Metropolitan Life Insurance Co.*, 277 U.S. 311 (1928). There, the Court stated that "[i]nsurance policies are traditionally contracts uberrimae fidei and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." *Id.* at 316; *see also id.* at 317 ("If, while the company deliberates, [the insured] discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure." (footnote omitted)). However, as we have already held, there is a genuine dispute regarding whether Mr. Ramsey's health as described in the application changed prior to the policy's delivery. Moreover, even if Mr. Ramsey breached his duty of good faith by misrepresenting the status of his health, Ohio law does not allow Penn Mutual to void the policy on that basis after incurring liability under its terms. *James*, 959 N.E.2d at 602.

In sum, summary judgment was inappropriate because there is a genuine dispute as to whether Mr. Ramsey misrepresented the state of his health by failing to disclose his rectal bleeding and doctor visits in 2010, and because the policy would be only voidable on that basis, not void.

IV.

The parties also dispute the propriety of the district court's denial of Plaintiff's cross-motion for summary judgment. Specifically, Penn Mutual argues that there is a genuine dispute as to whether Penn Mutual delivered Mr. Ramsey's policy after his cancer diagnosis—i.e., after the June 1, 2010, date that appears on the amendments. The district court did not address this argument, and it only denied Plaintiff's motion for summary judgment as a matter of course after concluding that summary judgment for Penn Mutual was appropriate. *See Ramsey*, 36 F. Supp. 3d at 773 ("Having concluded as a matter of law that Penn Mutual properly denied coverage for death benefits under the policies, I also conclude as a matter of law that Penn Mutual did not act in bad faith by doing so." (footnote omitted)). The case is remanded to allow the district court to consider in the first instance the parties' arguments related to Plaintiff's cross-motion for summary judgment.

V.

For the reasons stated above, we **REVERSE** the district court's grant of summary judgment to Penn Mutual and **REMAND** the case for further proceedings consistent with this opinion.