NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 18a0587n.06

Case No. 17-4177

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BEAU TOWNSEND FORD LINCOLN, INC., | ) ) ) | **FILED**<br>Nov 27, 2018<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| v. | ) ) | THE SOUTHERN DISTRICT OF OHIO |
| DON HINDS FORD, INC., | ) ) | |
| Defendant-Appellant. | ) | |

BEFORE: SILER and KETHLEDGE, Circuit Judges; OLIVER*, District Judge.

SILER, Circuit Judge. Don Hinds Ford agreed to purchase twenty Ford Explorers from Beau Townsend Ford for about $736,225. When it came time to close the deal, Beau Townsend's commercial sales manager asked, via email, that Don Hinds pay via wire transfer to an out-of-state bank. Don Hinds agreed, wired the money, and picked up the Explorers.

Just one problem—a hacker had infiltrated the email account of the Beau Townsend manager and sent Don Hinds fraudulent wiring instructions. Although Don Hinds thought it had paid Beau Townsend for the Explorers, it had actually wired the $736,225 to the hacker, who

---

* Hon. Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

quickly drained the bank account and made off with the money. This case is about who must bear that loss.

The district court granted summary judgment in Beau Townsend's favor, holding that it was entitled to receive payment for the Explorers and that Don Hinds must pay again. That decision was erroneous, as the district court failed to adequately analyze this complex issue. We therefore REVERSE and REMAND.

I.

Beau Townsend Ford Lincoln, Inc., a Ford dealership located in Vandalia, Ohio, offered to sell seventy-five excess Ford Explorers to other dealers. Beau Townsend's commercial sales manager, Jeff Columbro, contacted John Colglazier, the commercial account manager at Don Hinds Ford, Inc., a dealership in Fishers, Indiana. Columbro and Colglazier were acquainted and had previously worked together on dealer trades, as had their dealerships. Past dealer trades between Beau Townsend and Don Hinds had been for one or two vehicles at a time, and the purchaser had typically paid with a check at the time of delivery.

This deal, however, was much bigger. On September 25, Colglazier received an email from Columbro (jcolumbro@btford.com) asking if Don Hinds would be interested in purchasing some of the Explorers. Colglazier (jcolglazier@donhindsford.com) responded that same day, and after a flurry of emails, Don Hinds agreed to buy twenty Explorers. Columbro testified that Colglazier called him on the afternoon of September 25 to confirm the deal, and during the call the two agreed Don Hinds would pay by check. Colglazier, however, testified he did not recall ever speaking with Columbro on the phone regarding the Explorer deal, and all their correspondence occurred via email. In any event, the parties' September 25 communications concluded with Columbro's promising to send Colglazier invoices for the Explorers the next day.

Four days later, Columbro had still not sent the invoices, so Colglazier sent a follow-up email. This email (and the remainder of the emails Columbro received from Colglazier) came from a different email address (jcolglazier.donhindsford@gmail.com). However, the text of the emails Columbro received from Colglazier were authored by Colglazier.

Columbro responded to Colglazier's inquiry, saying that he would send the invoices once the Explorers moved "from fleet to stock." After Columbro sent half of the invoices, Colglazier replied stating that Don Hinds intended to pay for the vehicles with a check. Aside from the disputed telephone call mentioned earlier, this was the first time the parties discussed the method of payment. Colglazier received an email in reply, purportedly from Columbro, rejecting Don Hinds's offer to pay by check: "Due to some tax related procedures we will prefer a wire transfer, let me know when you need wiring instructions?"

Later that day, Colglazier received wiring instructions, again purportedly from Columbro, instructing Don Hinds to wire the money to a Bank of America in Missouri City, Texas, into the account of "K.B. Key Logistics LLC." The wire instructions stated, "Please follow the Standard Settlement Instructions below to remit payment to Beau Townsend Inc. and its subsidiaries," and contained the line "K.B. KEY LOGISTICS LLC d.b.a BEAU TOWNSEND FORD." Colglazier testified that he did not think Columbro's request for a wire transfer was unusual since this was a high-dollar trade involving a large number of vehicles.

The next day, September 30, Columbro sent Colglazier the remaining ten invoices. This allowed the parties to calculate the final sales price of $736,225.40. Colglazier responded that Don Hinds would send drivers to start picking up the Explorers on October 5.

On October 2, Colglazier emailed Columbro, copying Don Hinds' office manager, Alicia Robinson. Colglazier asked if Columbro could review Colglazier's paperwork to see if everything

was in order, and asked Robinson to transfer the money on October 5. Colglazier received a reply email purportedly from Columbro, stating that Colglazier's paperwork was in order. That email contained another copy of the wiring instructions. Colglazier forwarded the instructions to Robinson so she could arrange the payments.

Beginning on October 5 and continuing the next two days, drivers from Don Hinds picked up the Explorers from Beau Townsend. Due to daily transfer limits at Don Hinds' bank and the size of the transaction, Robinson wired the money in three installments, also beginning on October 5. Each time, Robinson sent a wire transfer confirmation to Columbro, and she received emails purportedly from Columbro that Beau Townsend had received the money. By October 7, Beau Townsend had wired over $736,000, and it had possession of the twenty Explorers, titles in hand. Everything seemed fine.

Unfortunately, however, some of the emails Colglazier had received from Columbro were not actually from Columbro. Rather, they were sent by a hacker who had infiltrated Columbro's email account as early as August 3.[1]

Beau Townsend used a third-party email service called FuseMail. FuseMail allows users to set up "rules" for how certain messages will be handled. Those rules can, for instance, automatically forward emails from a specified sender to a different email address. They can also automatically send emails affected by the rule to a different folder, such as the deleted items folder. After gaining access to Columbro's email, the hacker set up rules for how emails from certain senders, including Colglazier, would be handled in Columbro's FuseMail account. From September 28 onward, two things automatically happened when Columbro received an email from

---

[1] The parties do not discuss the identity or location of the hacker. However, the district court pointed out that Google records indicate the "jcolglazier.donhindsford@gmail.com" account was created by a user in Nigeria.

someone at Don Hinds: (1) the email was diverted to Columbro's deleted items folder, and (2) the email was forwarded to jcolglazier.donhindsford@gmail.com, a Gmail account the hacker created on September 28.

This setup enabled the hacker to perpetrate the scam. With access to Columbro's FuseMail account, the hacker could send emails to Colglazier from Columbro's official Beau Townsend Ford email address (jcolumbro@btford.com). Those emails appeared to Colglazier as if Columbro had sent them. Any emails from Don Hinds to Columbro were automatically diverted to Columbro's deleted items folder, where Columbro was unlikely to see them. But the Don Hinds emails were also forwarded to the Gmail account the hacker had created. The hacker then had the ability to forward the Don Hinds messages back to Columbro, where they would appear in his inbox. Although those messages arrived from a different email address than the first messages Columbro received from Colglazier—jcolglazier.donhindsford@gmail.com rather than jcolglazier@donhindsford.com—Columbro never noticed this switch because the messages still appeared as if they were sent by "John Colglazier" in Columbro's Microsoft Outlook email system. Thus, the hacker could filter the messages from Don Hinds to Columbro, allowing Columbro to see only the messages the hacker wanted him to see.

The parties' initial negotiations regarding the Explorer deal were conducted between Columbro and Colglazier. Once talk turned to payment, the hacker stepped in. Posing as Columbro, the hacker asked Don Hinds to pay via wire transfer and sent Colglazier the wire instructions. The hacker filtered out any messages from Don Hinds that would have tipped off Beau Townsend to the scheme. And once the wire transfers were complete, the hacker emptied the bank account and vanished.

Around the same time, Bill Estes Ford, located in Indianapolis, agreed to buy six Explorers for about $220,000, and received wire instructions purportedly from Columbro on October 9. These instructions differed from those received by Beau Townsend. Officials at Bill Estes became suspicious and contacted Beau Townsend. Columbro, who was away from the office, said he had not sent the wiring instructions. Columbro then called John Wanamaker, Beau Townsend's IT manager. Wanamaker asked Columbro to change his email password. He also contacted FuseMail to alert them that one of Beau Townsend's email accounts might have been compromised.

On Tuesday, October 13, Columbro received a call from a business contact, asking why he had not responded to her emails. Columbro said he had not received any such emails. He then called Wanamaker, who discovered that the emails Columbro had not seen were in Columbro's deleted-items folder. This prompted Wanamaker—for the first time—to look at the settings in Columbro's email account. Wanamaker discovered that the aforementioned "rules" had been set up to divert some emails into Columbro's deleted items folder, and to forward those emails to the fraudulent Gmail account.

Later that day, Columbro called Colglazier to ask when Beau Townsend could expect a check for the twenty Explorers. Colglazier told Columbro that Don Hinds had already wired the funds, in line with the instructions received via email. Beau Townsend requested that Don Hinds return the Explorers. Don Hinds refused.

Beau Townsend sued Don Hinds for (1) breach of contract, (2) conversion, and (3) unjust enrichment, constructive trust, and disgorgement. Following discovery, the parties filed cross-motions for summary judgment.

The district court granted summary judgment in Beau Townsend's favor. The court observed:

> [B]oth parties were negligent in their business practices. . . . Beau Townsend Ford should have maintained a more secure email system and taken quicker action upon learning that it might have been compromised. Don Hinds should have ascertained that an actual agent of Beau Townsend was requesting that it send money by wire transfer.

Nevertheless, the court held that Don Hinds breached the parties' agreement because "Beau Townsend Ford has not received any funds from Don Hinds Ford, or [] the funds wired to Missouri City, Texas on behalf of Don Hinds Ford." The court rejected Don Hinds' arguments that it was a good-faith purchaser for value and that equitable estoppel applied, and awarded Beau Townsend the $736,225.40 it requested. This appeal followed.[2]

## II.

We review a district court's grant of summary judgment de novo, "construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (citation omitted). All agree Ohio law governs this diversity action, so we apply the substantive law of Ohio, as interpreted by the Supreme Court of Ohio. *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 822 n.5 (6th Cir. 2015).

## III.

### A.

This case could be evaluated, in our estimation, in at least two distinct ways: under contract law or under agency law. Under contract principles, Ohio's codification of the Uniform Commercial Code (UCC) governs this case, as one involving the sale of goods. *AirBorn Elecs.,*

---

[2] The court also held that Beau Townsend's equitable claims were duplicative of its contract claim. Because Beau Townsend prevailed on its contract claim, the district court granted summary judgment in Don Hinds' favor on Beau Townsend's equitable claims. Only the contract claim is at issue in this appeal.

*Inc. v. Magnum Energy Sols., LLC*, 82 N.E.3d 504, 509 (Ohio Ct. App. 2017).  Additionally, we may look to an applicable Restatement (here, the Restatement of Contracts) for guidance "when there is no controlling state law on point when the state has indicated . . . that it considers the Restatements to be persuasive authority." *Garrison v. Jervis B. Well Co.*, 583 F.2d 258, 262 n.6 (6th Cir. 1978); *see, e.g.*, *Reilley v. Richards*, 632 N.E.2d 507, 509 (Ohio 1994) (relying on Restatement of Contracts).  Breach of contract in Ohio requires: "(1) a binding contract or agreement was formed; (2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach." *Carbone v. Nueva Constr. Grp., L.L.C.*, 83 N.E.3d 375, 380 (Ohio Ct. App. 2017) (cleaned up).

The ultimate question here is which party should bear the $736,225 loss attributable to the scheme perpetrated by an unidentified third-party fraudster.  Beau Townsend sees this case as a simple one—it delivered the twenty Explorers, but never received payment from Don Hinds. According to Beau Townsend, Don Hinds did not satisfy its obligation to pay for the Explorers by wiring the money to the Bank of America account in Texas, because Beau Townsend never received that money.  Therefore, Beau Townsend says, Don Hinds still owes Beau Townsend $736,225.

Don Hinds, meanwhile, argues that it was only obligated to follow the payment instructions it received from Beau Townsend, and not to ensure the payment made it to Beau Townsend. Because Don Hinds followed those instructions, and because it reasonably believed those instructions came from Beau Townsend, Don Hinds says it fulfilled its duties under the contract.

On the one hand, this case could turn upon a basic principle of contract law: mutual mistake. *See Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864).[3] In the contract setting, "[a] mistake is a belief that is not in accord with the facts." Restatement (Second) of Contracts § 151 (1981). Here, both parties held the mistaken belief that they had agreed on a method of payment. Colglazier had emailed Columbro saying Don Hinds intended to pay with a check, as they had in the past. Due to the hacker's deception, Columbro never saw any emails that would have caused him to second-guess Colglazier's assertion, and on October 13, he asked Colglazier when Beau Townsend could expect a check. Likewise, after the hacker posing as Columbro told Colglazier that Beau Townsend would prefer a wire transfer and sent instructions, Colglazier complied. Each party thought its own belief regarding payment was correct, and neither party knew the other was mistaken.[4]

Normally, "[w]here a mistake of both parties . . . as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake." *Id.* § 152(1). "A party bears the risk of a mistake when (a) the risk is allocated to him by agreement of the parties,

---

[3] *Raffles v. Wichelhaus* is the classic English case where two parties contracted for a shipment of cotton to be delivered from Bombay aboard a ship called the *Peerless*. The parties did not know, however, that there were in fact two ships called the *Peerless*, one departing in October, and the other in December. The buyers refused to accept or pay for the cotton delivered by the December *Peerless*, saying they had intended to buy cotton from the October *Peerless*. The court found that the existence of the two identically-named ships created a latent ambiguity in the contract. Because the buyer meant the October *Peerless* and the seller the December *Peerless*, and neither party had reason to know the meaning the other had assigned, the court held there was no mutual assent, and thus no binding contract.

[4] Columbro claims that Colglazier promised to pay by check during a phone call on September 25. However, Colglazier claims that all his deal-making with Columbro (and the hacker posing as Columbro) occurred via email. This is a disputed question of fact, and at the summary judgment stage, the court must accept Colglazier's account as true. *Crag v. Bridges Bros. Trucking, LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 255).

or (b) he . . . treats his limited knowledge as sufficient, or (c) . . . it is reasonable in the circumstances to [allocate the risk to a party]." *Id.* § 154.

*Reilley* provides a good example. There, a buyer purchased a piece of real estate, upon which he planned to build his family home. *Reilley*, 632 N.E.2d at 509. After signing the contract, the buyer discovered the property lay within a floodplain, and a city ordinance prohibited building any structure in such an area. *Id.* Neither the seller nor the buyer knew the property was in a floodplain at the time of contracting. *Id.* The Ohio Supreme Court held that "the lack of knowledge that a significant portion of the lot is located in a floodway is a mistake of fact of both parties that goes to the character of the property such that it severely frustrates the appellant's ability to build a home on the property." *Id.* It allowed the buyer to rescind the contract because "a mutual mistake existed as to the character of the property which is material to the subject matter of the contract and the appellant was not negligent in failing to discover the mistake." *Id.* at 354.

In this case, however, rescission is impractical at best, impossible at worst, and can never make the parties whole. Rescission would presumably involve the return of the Explorers to Beau Townsend. In that scenario, Don Hinds would still be out $736,225. Beau Townsend would also be worse off than when it started, since the Explorers' value will have depreciated. Moreover, the parties do not say whether Don Hinds resold the Explorers. If so, the buyers of those vehicles are likely good-faith purchasers for value, and the court cannot compel the buyers to return the vehicles to Beau Townsend. *See* Ohio Rev. Code § 1302.44(A).

So if rescission isn't an option, how should the loss be allocated? As noted earlier, in the case of a mutual mistake, the Restatement permits the court to allocate the risk of loss to a party when "it is reasonable in the circumstances to do so." Restatement (Second) of Contracts § 154(c). And *Reilley* suggests that the negligence (or lack thereof) of the parties should play at least some

role in allocating the risk. There, the court pointed out "that appellant, an unsophisticated buyer, was not negligent in failing to discover that the lot was in a designated floodplain." *Reilley*, 632 N.E.2d at 509. The property inspection had not revealed this information, and the buyer "could not have discovered[] the floodplain by looking at the property." *Id.* Presumably, had the buyer failed to conduct an inspection or ignored obvious signs that the property was within a floodplain, the court would have allocated the risk of loss to the buyer rather than allowing rescission. *See also Marshall v. Beach*, 758 N.E.2d 247, 251 (Ohio Ct. App. 2001) ("[I]t is well established in Ohio that relief for a unilateral mistake of material fact *will not* be provided where such mistake is the result of the negligence of the party seeking relief.").

The two factually similar cases cited by the parties also support the notion that the loss should be borne by the party best able to avoid it. *Arrow Truck Sales, Inc. v. Top Quality Truck & Equipment, Inc.* involved the sale of twelve trucks. No. 8:14-cv-2052-T-30TGW, 2015 WL 4936272, at *1 (M.D. Fla. Aug. 18, 2015). Joe Gelfo, a salesman for Top Quality, and Nick Lombardo, an assistant manager for Arrow, negotiated via email and eventually agreed that Arrow would purchase the trucks for $570,000. *Id.* Gelfo emailed Lombardo several documents, including copies of the truck titles and wiring instructions for payment. *Id.* Gelfo and Lombardo had previously done business together, and the wiring instructions were identical to the ones Gelfo had provided Lombardo in the past. *Id.*

During the parties' negotiations, third-party fraudsters hacked into the email accounts of both Gelfo and Lombardo. *Id.* at *3. They also created new email accounts that appeared nearly identical to Gelfo and Lombardo's accounts. *Id.* Eventually, the hacker used Gelfo's account to send Lombardo an email with "updated" wiring instructions, different from the ones he had previously received in this transaction and others. *Id.* The updated instructions specified an out-

of-state bank and a different beneficiary, though Top Quality was still listed on the document. *Id.* Arrow followed the "updated" instructions and unknowingly wired the $570,000 to the hacker. *Id.* at *4. Top Quality never received the money and refused to deliver the trucks to Arrow. *Id.* Arrow filed suit, asserting (as relevant here) that Top Quality breached its contract with Arrow by failing to deliver the trucks and, by failing to use reasonable security measures to protect its email accounts, negligently caused Arrow to wire $570,000 to the wrong account. *Id.* at *5.

Following a bench trial, the district court granted judgment in favor of Top Quality. The court held that Arrow, not Top Quality, breached the contract because Arrow never provided payment; therefore, Top Quality was not obligated to deliver the trucks. *Id.* As to negligence, the court found that "neither Gelfo nor Lombardo was negligent in the manner that they maintained their e-mail accounts. They were both victims of a sophisticated third-party fraudster . . . ." *Id.* at *4. But the court also found that "Lombardo had more opportunity and was in the better position to discover the fraudulent behavior based on the timing of the e-mails and the fact that the fraudulent wiring instructions involved . . . different account information from all of the previous wiring instructions." *Id.* "[A]t the very least," the court said, "the change in wiring instructions and conflicting e-mails should have prompted Lombardo to confirm the information with Gelfo prior to wiring any funds." *Id.* Because Lombardo failed to "exercise[] reasonable care after receiving conflicting e-mails containing conflicting wire instructions," the court held that "Arrow should suffer the loss associated with the fraud." *Id.* at *6.

In *Bile v. RREMC, LLC*, No. 3:15cv051, 2016 WL 4487864 (E.D. Va. Aug. 24, 2016), the plaintiff, Amangoua Bile, won a $63,000 settlement in an employment discrimination suit. *Id.* at *1. A few days after reaching the settlement, Bile's counsel, Uduak Ubom, received an email purportedly from Bile, asking that the settlement funds be wired to a Barclay's account in London.

*Id.* at *3. Ubom called Bile, who told Ubom that she had not sent the email. *Id.* Ubom deleted the email and did not notify LeClairRyan, P.C., the firm representing the defendants, that someone had attempted to divert the settlement. *Id.*

Two days later, Ubom and Olaolowaposi Oshinowo, an attorney at LeClairRyan, agreed over the phone that LeClairRyan would send Bile a check for the settlement funds to his residence. *Id.* at *4. Ubom emailed Bile's home address to Oshinowo following their conversation. *Id.* Later that day, however, Oshinowo received another email, purportedly from Ubom, asking that the settlement funds be wired to the Barclay's account. *Id.* Oshinowo believed this email came from Ubom because it was sent from his email address and used syntax consistent with the emails Oshinowo had previously received from Ubom. *Id.* LeClairRyan followed the wire instructions and transferred the money to the Barclay's account. *Id.* at *5. Eventually, the parties discovered that the wire instructions were sent by a hacker who had infiltrated Ubom's email account. *Id.* LeClairRyan refused to send another payment, and the parties filed cross-motions to enforce the settlement agreement.

Following a bench trial, the district court ruled in the defendants' favor. Recognizing there was "no case law precisely on point," the court looked to "common law contract principles and . . . Article 3 of the U.C.C." to conclude that the defendants "substantially performed under the Settlement Agreement." *Id.* at *6. In particular, the court found persuasive the UCC's rules regarding fraud in the transfer of negotiable instruments. Typically, "if a payor issues an instrument but fails to deliver the instrument to the payee's possession, then the payor is still liable on the underlying obligation." *Id.* at *8 (citing UCC § 3-420 & cmt. 1). However, under UCC §§ 3-404 and 3-406, which address third-party fraud in negotiable instruments, "a party whose failure to take ordinary care results in loss must be the party to bear that loss," and "a blameless party is

entitled to rely on reasonable representations, even when those reasonable representations are made by fraudsters."[5] *Id.* at *8.

Applying those general principles, the court concluded "Ubom[] failed to use ordinary care under the circumstances[, and t]hat failure substantially contributed to the $63,000.00 loss." *Id.* at *11. "Two days before the fraud was perpetrated on LeClairRyan, both Ubom and Bile were aware that an unidentified third party had targeted the settlement funds for diversion to a Barclay's bank account that had nothing to do with Bile"; still, they did not warn LeClairRyan that the settlement had been targeted by a third-party fraudster. *Id.* If LeClairRyan had been aware of this suspicious activity, the court found it "self-evident" the firm would not have initiated the wire transfer. *Id.* In contrast, the court found LeClairRyan "exercise[d] ordinary care" in carrying out its end of the transaction. *Id.* at *12. The court held the defendants were entitled to enforce the settlement agreement without paying a second settlement because Ubom's failure to alert opposing counsel to the fraud "substantially contributed" to the loss. *Id.* at *13.

*Arrow* and *Bile* illustrate the principle that losses attributable to fraud should be borne by the party in the best position to prevent the fraud. *Arrow*, 2015 WL 4936272, at *6; *Bile*, 2016 WL 4487864, at *13. So too here. The district court erred by taking an overly simplistic view of this case. The court observed that, "[i]f there is a policy implicit in the UCC's rules for the

---

[5] UCC § 3-404 governs cases where an imposter has induced someone to issue a check. The section states that, if the imposter "induces the issuer" to issue a check "by impersonating the payee," then "an indorsement of the instrument by any person in the name of the payee is effective . . . in favor of a person who, in good faith, pays the instrument[.]" UCC § 3-404(a); Ohio Rev. Code § 1303.44(A). The section adds, however, that whoever bears the loss could recover from the person paying the check if that person "fail[ed] to exercise ordinary care . . . that substantially contributes to [the] loss." Ohio Rev. Code § 1303.44(D). Likewise, § 3-406 states that, "[a] person whose failure to exercise ordinary care substantially contributes to . . . the making of a forged signature on an instrument is precluded from asserting [that] forgery against a person who, in good faith, pays the instrument[.]" *See also* Ohio Rev. Code § 1303.49(A).

allocation of losses due to fraud, it surely is that the loss be placed on the party in the best position to prevent it." Further, the court declared that "both parties were negligent in their business practices." Nevertheless, the court awarded summary judgment to Beau Townsend simply "[b]ecause Don Hinds Ford has not conveyed the contractual purchase price to Beau Townsend Ford." In so holding, the court ignored the authority it cited, as well as record evidence suggesting Beau Townsend was at least partially responsible for its own losses. Here, if principles taken from UCC Article 3 are applied, the court would have to determine whether either Beau Townsend's or Don Hinds' failure to exercise ordinary care contributed to the hacker's success, and would then have to apportion the loss according to their comparative fault.

B.

Agency law also provides useful guideposts here. For questions of agency law, the Ohio Supreme Court has consulted the Restatement (Third) of Agency. *See, e.g.*, *Auer v. Paliath*, 17 N.E.3d 561, 566 (Ohio 2014); *Cincinnati Golf Mgt., Inc. v. Testa*, 971 N.E.2d 929, 934-35 (Ohio 2012). According to the Restatement, if a person "carelessly caused [the] belief" that "an actor has authority as an agent," the person "is subject to liability to a third party who justifiably is induced to make a detrimental change in position because the transaction is believed to be on the person's account." Restatement (Third) of Agency § 2.05. This is true even if the person did not make "a manifestation that [the] actor has authority as an agent." *Id.* The Restatement explains that this doctrine, which it calls "agency by estoppel," "encompasses definitions of 'ostensible authority' that hold a principal accountable for an appearance of authority arising solely from the principal's failure to use ordinary care." *Id.* cmt. b.

The Restatement cites an Ohio Court of Appeals case, *Luken v. Buckeye Parking Corporation*, 68 N.E.2d 217 (Ohio Ct. App. 1945). *Id.* reporter's notes, cmt. d. In *Luken*, a company operated a parking lot in Cincinnati. 68 N.E.2d at 217-18. Although the company typically hired an attendant to

man the lot, it was unable to staff the lot one day. *Id.* at 218. The company closed the lot for the day and blocked the entrance with a log. *Id.* That same day, a seventeen-year-old boy began posing as the attendant. *Id.* No one at the company knew that the boy was there, let alone pretending to be the lot attendant. *Id.* Soon thereafter, Ms. Luken, who had used the lot for two years, sought to park her car. *Id.* As the court described it, "she found nothing different from [the lot's] appearance on previous occasions." *Id.* The lot's sign was up; the entrance was open; cars were parked there; and a young man, "with what appeared to be parking tickets in his hand," approached Ms. Luken. *Id.* She thought the boy was the parking attendant, so she left her keys with him. *Id.* After she left the lot, the boy took her car for a joyride and crashed it. *Id.* She sued the company for negligence. *See id.* at 220.

The Ohio Court of Appeals described the company's failure to secure the parking lot and characterized the boy as "an imposter [who] took advantage of the situation to enter the place and transact business as though he were authorized." *Id.* at 219. The court determined that the company's omissions estopped it from "deny[ing] that the imposter was its duly authorized agent." *Id.* at 220. The company could be liable, the court held, if a "customer who was justified in relying . . . did rely on the appearance of authority." *Id.* The court added, however, that the customer could be justified in relying on the appearance of authority only if she did so in good faith and exercised reasonable care. *Id.* Ultimately, the court concluded that "[t]his situation raised issues for submission to the jury." *Id.*

Here, the application of the Restatement and *Luken* suggest that, if Beau Townsend had failed to exercise ordinary care in maintaining its email server, thus allowing the hacker to pose as Columbro, then Beau Townsend could be liable for Don Hinds's reasonable reliance on the hacker's emails. In addition, any potential liability would be reduced if Don Hinds also failed to exercise reasonable care.

Ohio cases decided after *Luken*, however, have not consistently applied this doctrine. Some cases suggest that a party's failure to exercise ordinary care is insufficient to establish agency by estoppel. These cases instead required that the alleged principal have had knowledge of the ostensible agent or have acted to "hold out" the third party as an agent. *See, e.g.*, *Comer v. Risko*, 833 N.E.2d 712, 715 (Ohio 2005); *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 768 N.E.2d 619, 643 (Ohio 2002). But *Luken* has never been overruled, and the majority of modern Ohio cases applying agency by estoppel have involved hospitals, which present different issues of liability compared to general commercial cases. *E.g.*, *Comer*, 833 N.E.2d at 715; *Harris v. Mt. Sinai Med. Ctr.*, 876 N.E.2d 1201, 1208-09 (Ohio 2007); *Clark v. Sw. Hosp. & Family Health Ctr.*, 628 N.E.2d 46, 48 (Ohio 1994). Thus, it is unclear whether *Luken* still governs a case like this.

## C.

Given the amount of business transacted online, the assignment of liability in a case like this is important. Indeed, both parties acknowledge that they regularly sell cars by email. The district court did not adequately analyze the issue. Instead, the court begged the question, concluding (without citing legal authority) that "[i]t was not Beau Townsend that instructed Don Hinds to send funds to 'K.B. KEY LOGISTICS, L.L.C.' in Missouri City, Texas."

The district court aptly observed that "[b]oth parties would each have the Court find that the other was in the best position to avoid the misfortune that occurred in this case." Beau Townsend, pointing to the suspicious nature of the wire instructions, says Don Hinds could have prevented the loss; Don Hinds, pointing to the fact that Beau Townsend's email was hacked, says the same about Beau Townsend. And both parties support their respective arguments with record evidence suggesting the other party was at fault.

No court can resolve these factual disputes at the summary judgment stage. *Anderson*, 477 U.S. at 255. Rather, the district court must hold a trial to decide whether and to what degree each party is responsible for the $730,000 loss in this case. Indeed, this was the approach taken by the courts in *Arrow* and *Bile*, both of which were decided after a bench trial. UCC Article 3, upon which both the *Arrow* and *Bile* courts relied, also suggests this question should be left to a factfinder: "No attempt is made to define particular conduct that will constitute 'failure to exercise ordinary care . . . .' Rather, 'ordinary care' is defined . . . in general terms. The question is left to the court or the jury for decision in light of the circumstances in the particular case . . . ." UCC § 3-406 cmt. 1.

Although the district court's error is understandable given the dearth of authority in this area, it is error nonetheless. To decide this case, the factfinder must determine which party "was in the best position to prevent the fraud." *Arrow*, 2015 WL 4936272, at *6. To answer that question, there must necessarily be findings of fact. And to make findings of fact, the district court must hold a trial.

REVERSED and REMANDED.