RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KAREN FROHN, Individually and on behalf of all others
similarly situated,

                    *Plaintiff-Appellant*,

      *v.*

GLOBE LIFE AND ACCIDENT INSURANCE COMPANY,

                  *Defendant-Appellee*.

> No. 23-3530

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00713—Douglas Russell Cole, District Judge.

Argued:  February 1, 2024

Decided and Filed:  April 29, 2024

Before:  SILER, NALBANDIAN, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Todd B. Naylor, GOLDENBERG SCHNEIDER L.P.A., Cincinnati, Ohio, for
Appellant.  Glennon P. Fogarty, HUSCH BLACKWELL LLP, St. Louis, Missouri, for Appellee.
**ON BRIEF:**  Todd B. Naylor, Jeffrey S. Goldenberg, GOLDENBERG SCHNEIDER L.P.A.,
Cincinnati, Ohio, Catharin R. Taylor, CLEMENTS, TAYLOR, BUTKOVICH & COHEN, LPA,
Cincinnati, Ohio, for Appellant.  Glennon P. Fogarty, David W. Sobelman, Melissa Z. Baris,
HUSCH BLACKWELL LLP, St. Louis, Missouri, Jeffrey A. Lipps, Michael N. Beekhuizen,
CARPENTER LIPPS LLP, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

MATHIS, Circuit Judge.  Karen Frohn cared for her husband, Greg Frohn, during their entire marriage.[1]  In January 2018, Karen applied for and received a life insurance policy on her husband's life from Globe Life and Accident Insurance Company.  Greg died about nine months after that, and Karen submitted a claim for death benefits that Globe later denied.  Karen then sued Globe individually and on behalf of a putative class of beneficiaries challenging the denial of her claim.

As Karen's case progressed, the parties made several motions relevant here.  First, Karen moved for a protective order to prevent Globe from seeking Greg's medical records and medical history during discovery.  The district court denied that motion in part.  After that, Globe moved for summary judgment, arguing that it was entitled to rescind the life insurance policy because Karen was not truthful in her application for insurance.  The district court granted Globe's motion, barring Karen from recovery on her claims against Globe.  Karen also asked the court to redact certain portions of that order, but the district court published it without any redactions.  Karen challenges these three decisions on appeal.  For the reasons below, we affirm.

**I.**

**A.**

From their marriage in 2002 until Greg's death in September 2018, Karen drove and accompanied her husband to almost all his medical appointments.  Greg did not have a driver's license because of his multiple DUI convictions.  At any rate, Karen wanted to accompany Greg to his medical appointments so that she could "know what was going on with [her] husband."  R. 50, PageID 846.  And Greg apparently "felt more comfortable" with his wife there,

---

[1]We refer to Karen Frohn and Greg Frohn extensively throughout this opinion.  For clarity, we refer to these individuals by their first names.

too.  *Id.*  According to Karen, she and her husband "listen[ed] carefully" during these visits to what Greg's doctors relayed about his health and his future treatment.  *Id.* at 984.

Greg's medical history is extensive and spans several years.  Pertinent to this appeal is his history of liver function abnormality and depression.[2]  Greg saw at least two doctors: his primary care physician, Dr. Kevin Budke, and his pain specialist, Dr. Christine Smith.  Both doctors worked for the Tri-Health healthcare system in Cincinnati, Ohio.

**1.**

*Greg's Liver Function Abnormality*.  As Greg's primary care physician, Dr. Budke diagnosed Greg with liver function abnormality every year from 2013 to 2017.  Dr. Budke's diagnosis led to his periodic testing of Greg's liver function.  In January 2017, for example, Greg's blood work revealed an "AST" level of 214 and an "ALT" level of 101, both measures of liver functionality.  According to Dr. Budke, a healthy AST range is 10 to 40 while a healthy ALT range is 10 to 60.

In addition to routinely monitoring Greg's liver function through tests like this, and because alcohol can impair that function, Dr. Budke also encouraged Greg to reduce his alcohol consumption.  Although the timeline is unclear, Greg consistently drank a lot of alcohol.  At times, he reported drinking as little as 6 drinks a day while at other times he reported drinking as many as 24 drinks a day.

Karen sometimes involved herself in discussions about her husband's liver function.  Take her June 2014 call to Dr. Budke's office, for example, where she asked for more information about Greg's "platelet and liver function test results."  R. 50-9, PageID 1214.  Dr. Budke's records also indicate that, about a year later, his staff "spoke to [Karen]" and gave her Greg's liver function test results, and she "verbalized understanding" those results.  R. 50-10, PageID 1216–17.  Karen testified that she did not remember having any discussions about her husband's liver diagnoses, but she did not deny that these calls or discussions occurred.

---

[2]Doctors also diagnosed Greg with alcohol abuse, stiff-person syndrome, thrombocytopenia, anemia, and hypertension.

**2.**

*Greg's Depression.*   As his primary care physician, Dr. Budke also treated Greg for depression.  Medical records reflect that Greg was taking at least two medications to treat his depression—a June 2014 record indicates he was taking Tofranil, which could have helped with pain control but was "most likely" for his depression, R. 51, PageID 1429, and records from 2015, 2017, and 2018 indicate he was taking Cymbalta.  Karen testified that she remembered Greg taking Cymbalta to treat both his pain and depression.

By at least 2013, Greg suffered from chronic neck and back pain, causing his mental health to worsen.  The Frohns did not know the source of Greg's pain, but it caused him to lose mobility and struggle to complete everyday tasks.  By around 2017, Greg struggled to raise his hands above his head, put on socks, get out of bed, or walk without support.  He lost his job because of the pain.  Dr. Smith diagnosed Greg with stiff-person syndrome, a rare neurological condition.

Several records indicate that Greg became depressed after losing his job and due to the pain.  Dr. Budke's records indicate that "[Karen] feels [Greg] is depressed about the job loss" and that Greg admitted he was still "grieiving [sic] over a job he had held for many years." R. 50-14, PageID 1225.  In 2017, the Frohns appealed a denial of Greg's social security disability benefits.  A handwritten statement prepared for that appeal provides that Greg was "very depressed" because of "his debilitating disease." R. 50-3, PageID 1200.

**B.**

In January 2018, Karen applied to Globe for life insurance on Greg.  The insurance application asked Karen to answer truthfully the following questions:

1. Is the Proposed Insured currently disabled due to illness . . . ?

2. In the past 3 years, has the Proposed Insured been diagnosed or treated by a member of the medical profession for:

    (a) Cancer, coronary artery disease, or any disease or disorder of the heart, brain, or liver?

> (b)      Chronic kidney disease or kidney failure, muscular disease, mental or nervous disorder, chronic obstructive lung disease, drug or alcohol abuse, or hospitalized for diabetes?
>
> . . . .
>
> 3.       Does the Proposed Insured have any chronic illness or condition which requires periodic medical care or may require future surgery?

R. 53-13, PageID 2404.  Karen answered "yes" to question 1, but "no" to every other question.

After Karen submitted the application, a Globe underwriting representative contacted her to discuss the application further.  Globe typically did this before issuing a policy.  During that call, Karen reiterated her "no" answers to questions 2(a) and 2(b).  But Karen told Globe that Greg suffered from neck and back pain, that he had applied for social security disability benefits, and that he used medication for pain management.  The underwriter then changed Karen's answer to question 3 from "no" to "yes," and, based on Karen's answers in the application and during the underwriting call, Globe issued Greg a "Sub-Standard A" life insurance policy (the "Policy").  Globe also sent Karen a copy of the corrected application along with other policy-related materials.

The Policy, which became effective in February 2018, named Karen as the beneficiary.  Under the heading "DEATH BENEFIT PAYABLE," the Policy provides that Globe:

> Will pay the proceeds of this policy to the Beneficiary when We receive due proof that the Insured's death occurred while this policy was in force (or not later than two months after receipt of such proof).

R. 53-14, PageID 2412.  Under the heading "THE CONTRACT," the Policy states:

> Read Your policy carefully.  This policy is a legal contract.  The entire contract is this policy and the attached application. . . .  No statement can cancel this policy or be used in Our defense if We refuse to pay a claim unless it is found in the attached application.

*Id.* at 2414.  And under the heading "INCONTESTABILITY," the Policy reads:

> Unless You do not pay the premiums due, We cannot contest this policy after it has been in force during the Insured's lifetime for 2 years from the Policy Effective Date.

*Id.* at 2415.  The Policy did "not require a beneficiary to submit the deceased's medical records" before Globe processed her claim.  *Frohn v. Globe Life & Accident Ins. Co.*, 667 F. Supp. 3d 715, 722 (S.D. Ohio 2023).

## C.

Greg died on September 26, 2018, within the Policy's contestability period.  Around October 1, 2018, Karen called Globe to report Greg's death.  On October 2, Globe sent Karen a letter requesting several items, including a "Claimant's Statement," an "Authorization for Release of Health Information Pursuant to HIPAA," a "Physician's Statement," and the "Certified Death Certificate."  Karen complied and submitted this paperwork about two weeks later.

Dr. Budke completed Greg's death certificate and the Physician's Statement.  On the Physician's Statement, Dr. Budke reported treating Greg since 2009 for hypertension, cervical spinal stenosis, alcohol abuse, and depression.

Karen also completed and signed the Authorization for Release.  The Authorization allowed medical providers to release Greg's medical records and other medical information to Globe.  It also allowed Karen to revoke the Authorization at any time unless Globe had "a legal right to contest a claim."  R. 50-19, PageID 1248.

After receiving these documents from Karen, Globe sent her another letter on October 26, 2018.  This letter explained to Karen that because Greg's "death occurred within the 2-year contestable period, it will be necessary for us to request some information from the medical providers that provided treatment to the insured over the past few years."  R. 61-1, PageID 3293.  And it further informed Karen that "no further action is needed by you at this time."  *Id.*

But the record reflects that Karen, without any request from Globe, contacted TriHealth to expedite its production of medical records.  As Globe points out, in November 2018, "TriHealth sent Globe . . . [Greg's] medical records under a fax cover stating: 'Our Copy Service is working on this request but as a courtesy to the patient's wife, I am sending records directly from the Office.'"  D. 28 at pp.25–26.  Speaking with a Globe customer service representative,

Karen explained that she called TriHealth to have them fax her husband's medical records to Globe and that TriHealth had complied "[t]wice now." R. 61-1, PageID 3296–97. She also called Globe multiple times to inquire what was taking so long to review her claim.

Ultimately, Globe denied Karen's claim. Globe explained that Greg's medical records "indicate[d] prior medical conditions which include but may not be limited to a history of alcohol abuse with abnormal liver function tests, hypertension, neurological stiff person syndrome." R. 67-1, PageID 4142. Globe reimbursed Karen for all premiums paid.

**D.**

In August 2019, Karen sued Globe, individually and on behalf of a putative class of beneficiaries. She alleged that Globe breached the Policy and its duty of good faith and fair dealing.

As the case progressed, Globe requested additional medical records from Karen. In response, Karen moved for a protective order. She sought to prohibit Globe's further discovery of Greg's medical records, arguing that the physician-patient privilege protected those records. Karen also purported to revoke the medical release. The district court granted Karen's request in part. *Frohn v. Globe Life & Accident Ins. Co.*, No. 1:19-cv-713, 2020 WL 13832151, at *1 (S.D. Ohio Oct. 14, 2020). Finding Greg's older medical records irrelevant to Globe's defense, it held that Globe could not seek Greg's medical information from before January 10, 2013. *Id.* at *3. But the district court also denied Karen's motion in part, finding that (1) Karen's attempted revocation was "ineffective," and (2) Globe could seek Greg's medical information from January 10, 2013, and beyond. *Id.* at *3–5.

Thereafter, Globe moved for summary judgment, arguing that it was entitled to rescind the Policy under Ohio Revised Code § 3911.06. The district court granted Globe's motion for summary judgment, holding that: (1) Karen voluntarily executed the Authorization for Release thereby waiving Greg's physician-patient privilege, and (2) Globe was entitled to rescind under § 3911.06, barring Karen from recovery on either of her claims. *Frohn*, 667 F. Supp. 3d at 718–19, 734.

With its order on Globe's motion for summary judgment, the district court also "imposed a temporary seal" on that decision because it "had allowed the parties to file certain exhibits and information relating to [Globe's] motion under seal." R. 87, PageID 6391. The district court then asked Karen and Globe "whether they believed portions of [that order] warranted redaction." *Id.* Karen wanted the court to redact references to Greg's various ailments and the activities that contributed to those ailments, while Globe argued no redactions were necessary. In the end, the district court published its order on Globe's motion for summary judgment without any redactions. But it delayed doing so for two weeks to allow Karen "an opportunity before publication to seek relief from the Sixth Circuit" on that issue. *Id.* at 6397. She did not seek relief from this court during that two-week period. Instead, this appeal followed.

## II.

On appeal, Karen argues that the district court erred by: (1) finding that Karen waived the physician-patient privilege as to Greg's medical records and information; (2) denying in part Karen's motion for a protective order; (3) granting Globe's motion for summary judgment upon determining that Globe properly rescinded the Policy[3]; and (4) refusing to redact or seal its order granting summary judgment to Globe. We address each argument in turn.

This action is premised on diversity of jurisdiction, 28 U.S.C. § 1332(d)(2), and the parties agree that Ohio substantive law applies, *Baker Hughes Inc. v. S&S Chem., LLC*, 836 F.3d 554, 560 (6th Cir. 2016).

### A.

*Did Karen voluntarily waive the physician-patient privilege?* Ohio Revised Code § 2317.02(B) governs the physician-patient privilege. The privilege protects "communication[s]" between a physician and his or her patient that are meant to "diagnose, treat, prescribe, or act for a patient." Ohio Rev. Code Ann. § 2317.02(B)(1), (B)(5)(a). This includes medical records. *Med. Mut. of Ohio v. Schlotterer*, 909 N.E.2d 1237, 1240 (Ohio 2009). Ohio courts strictly construe the physician-patient privilege "against the party seeking to assert it and

---

[3]We review the district court's grant of summary judgment de novo. *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368 (6th Cir. 2024).

[it] may be applied only to those circumstances specifically named in the statute." *Ward v. Summa Health Sys.*, 943 N.E.2d 514, 518 (Ohio 2010).

The physician-patient privilege is not absolute—it "contains a number of exceptions." *Id.* at 519. Relevant here, the spouse of a deceased patient may waive the physician-patient privilege by giving her "express consent." Ohio Rev. Code Ann. § 2317.02(B)(1)(a)(ii). Such consent "to the release of medical information is valid, and waives the physician-patient privilege, if it is voluntary, express, and reasonably specific in identifying to whom the information is to be delivered." *Schlotterer*, 909 N.E.2d at 1241. By executing the Authorization for Release, Karen gave express consent for Greg's medical providers to disclose his privileged medical information to Globe. Thus, the only dispute is whether she did so voluntarily.

A person acts voluntarily when "the decision is one's own choice." *State v. Brunson*, 218 N.E.3d 765, 776 (Ohio 2022) (citation omitted); *see also Chadwick v. Barba Lou, Inc.*, 431 N.E.2d 660, 662 n.2 (Ohio 1982) (defining "voluntary" as "proceeding . . . from one's own choice or consent" (citation omitted)). Because "ignorance is easily seen as a form of compulsion[,] it could hardly be said that one had 'voluntarily' disclosed something if one was not aware that the disclosure was taking place." 25 Charles Alan Wright et al., Fed. Prac. & Proc. § 5552 (1st ed. 2023 update).

The Ohio Supreme Court defines "waiver" as "a voluntary relinquishment of a known right . . . , whether contractual, statutory, or constitutional." *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 118 (Ohio 2006). Courts can find a waiver in many circumstances, but it typically involves waiving a right "by express words or conduct that is inconsistent with that right." *Gembarski v. PartSource, Inc.*, 134 N.E.3d 1175, 1180 (Ohio 2019).

Karen voluntarily waived Greg's physician-patient privilege by signing the Authorization for Release. That document notified Karen that the information disclosed would include Greg's "entire medical record and any other protected health information concerning [him]." R. 73-12, PageID 5210. Karen argues that the waiver was not voluntary because she had no choice but to sign it if she wanted her claim processed. But she did have another option—she could have sued

to enforce her rights under the Policy.  At a minimum, she could have made some effort to contest Globe's request for the medical records.  But she did not.  And the fact that Karen had to "decide between . . . unattractive choices does not invalidate the waiver."  *Cf. State v. Benton*, 695 N.E.2d 757, 762 (Ohio 1998).

More to the point, the record demonstrates that Karen did not hesitate to disclose Greg's medical records.  After executing the Authorization for Release and sending it to Globe, Karen directed Greg's medical provider to send Greg's medical records to Globe.  Considering this, the undisputed evidence demonstrates that Karen voluntarily waived Greg's physician-patient privilege.  Karen does not point to any coercion or duress that would invalidate her waiver of the privilege.

Karen's arguments in response do not change this conclusion.

**1.**

First, Karen argues that Globe had no right to request the medical-records release before processing her claim without an express right to do so under the Policy.  In the Policy, Globe agreed to "pay the proceeds of this policy to the Beneficiary when We receive due proof that the insured's death occurred while this policy was in force (or not later than two months after receipt of such proof)."  Based on this provision, it seems that Karen was not required to execute the medical-records release for Globe to process her claim.  But she did.  By doing so, she waived any right to require Globe to pay her claim without reviewing Greg's medical records.

We must presume that Karen knew of her rights under the Policy.  In Ohio, the "parties to contracts are presumed to have read and understood them and that a signatory is bound by a contract that he or she willingly signed."  *Preferred Cap., Inc. v. Power Eng'g Grp., Inc.*, 860 N.E.2d 741, 745 (Ohio 2007).  When Globe asked Karen to sign the medical-records release before it processed her claim, we presume she understood that Globe had no entitlement to the records.  Karen argues that Globe deceived her.  But by stating that Karen "must" sign a medical release for Globe "to evaluate this claim," Globe may have been truthfully describing its internal practices, even if they ran afoul of the contract.  Karen does not argue that she misunderstood her contractual rights, nor does she argue that she did not willingly sign the Policy.  Accordingly,

Karen "knew of [her] right to assert an argument or defense." *See Gembarski*, 134 N.E.3d at 1181.

Karen thus waived her contractual rights. As mentioned above, "[a] waiver is a voluntary relinquishment of a known right." *White Co. v. Canton Transp. Co.*, 2 N.E.2d 501, 505 (Ohio 1936) (quotation omitted). A waiver of a contractual right generally requires consideration "unless the actions of the party making the waiver are such that [she] must be estopped from insisting upon the right claimed to have been relinquished." *Mark-It Place Foods, Inc. v. New Plan Excel Realty Tr.*, 804 N.E.2d 979, 1000 (Ohio Ct. App. 2004) (citation omitted). Karen's actions show that her contractual waiver did not require consideration.

Undisputed evidence shows Karen acted inconsistently with her right under the Policy to have her claim processed without the release of Greg's medical records. She sent Globe the medical-records release, a claimant's statement, Greg's certified death certificate, and a statement of physician (each containing Greg's medical information) only two weeks after Globe requested those documents. Karen then contacted TriHealth more than once to expedite the production of Greg's medical records. And she called Globe to ensure that it received the medical records. Karen acted in such a way that she must be estopped from insisting on her right to processing of her claim without Greg's medical records.

**2.**

Second, Karen argues that a finding that she waived her husband's physician-patient privilege violates Ohio public policy. Karen points to Ohio authority condemning the practice of offering low awards and forcing the insured to sue for full recovery—a practice that did not take place here. She also points to the Ohio Supreme Court's statement that "public policy favors" physician-patient confidentiality. *Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, 524 (Ohio 1999) (quoting *MacDonald v. Clinger*, 84 A.D.2d 482, 487 (N.Y. App. Div. 1982)). But within the same sentence, the Ohio Supreme Court said that "there is a countervailing public interest to which [confidentiality] must yield in appropriate circumstances." *Id.* Karen does not cite a statement of Ohio public policy that addresses her circumstances, so her arguments on this point fail.

**B.**

*Did the district court err by denying, in part, Karen's motion for a protective order?* Karen sought a protective order to prevent Globe from obtaining information about Greg's medical history from Karen or any third party after she purported to revoke the medical release. The district court denied in part Karen's motion. *Frohn*, 2020 WL 13832151, at *1. Finding Greg's older medical records were not relevant to Globe's defense, it held that Globe could not seek Greg's medical information from before January 10, 2013. *Id.* at *3. But the court also held that Karen's attempted revocation was "ineffective," and that Globe could seek Greg's medical information "from January 10, 2013, onward."[4] *Id.* at *4–5.

The district court reached this decision after considering whether Karen voluntarily waived Greg's physician-patient privilege. *Id.* at *4. In the end, the court decided not to resolve the physician-patient privilege issue in deciding a "discovery dispute." *Id.* Karen argues on appeal that the district court erred in denying her motion in part without first deciding whether her waiver was voluntary. Even so, any such error would be harmless. In its order granting summary judgment, the district court ultimately concluded that Karen "executed the waiver voluntarily." *Frohn*, 667 F. Supp. 3d at 726. For the reasons we explained in Part II.A. above, we agree.

Karen also argues that the district court erred by finding that her attempted revocation of the medical release was ineffective. She attempted to revoke her medical release waiver via email, about one and a half years after executing it in the fall of 2018. And so, she argues that even if she signed that document voluntarily, she withdrew her consent when her attorney emailed Globe's counsel to that effect in April 2020.

The district court "easily disposed of" this argument. *Frohn*, 2020 WL 13832151, at *4. Globe's Authorization for Release form states that although Karen could withdraw her waiver, "any such 'revocation is not effective to the extent that . . . [Globe] has a legal right to contest a

---

[4]We review the district court's decision for an abuse of discretion. *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 235 (6th Cir. 2016). We will reverse a district court's decision on a discovery matter "only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." *Himes v. United States*, 645 F.3d 771, 782 (6th Cir. 2011) (quoting *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009)).

claim under an insurance policy or to contest the policy itself.'" *Id.* The district court found that this "condition [was] met," so it concluded that Karen's "attempted withdrawal [was] ineffective." *Id.*

Karen argues this right-to-contest condition does not apply because it is inconsistent with 45 C.F.R. § 164.508(b)(5). That provision states:

> An individual may revoke an authorization provided under this section at any time, provided that the revocation is in writing, except to the extent that:
>
> (i)      The covered entity has taken action in reliance thereon; or
>
> (ii)     If the authorization was obtained as a condition of obtaining insurance coverage, other law provides the insurer with the right to contest a claim under the policy or the policy itself.

The general rule of § 164.508 that requires authorization applies to "covered entit[ies]." *Id.* § 164.508(a)(1). A covered entity is a health plan, a health care clearinghouse, or "[a] health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter." *Id.* § 160.103. So the authorization requirement and its exceptions apply (if at all) to the medical providers that treated Greg, not to Globe. When the medical providers relied on Karen's waiver to disclose medical records before her revocation, the reliance safe harbor in § 164.508(b)(5)(i) applied. And when medical providers disclosed medical records after the revocation, § 164.508 posed no obstacle. That is because a different regulation, § 164.512(e)(1)(ii), permits healthcare providers to respond to a discovery request without any authorization, so long as the subject of the health information receives notice. That regulation also permits disclosure without authorization in response to a court order. *Id.* § 164.512(e)(1)(i). Therefore, any error in construing the purported revocation was harmless because Globe did not need Karen's authorization under the regulations.

What is more, Karen has not identified what documents, if any, her revocation should have prevented the district court from considering. Accordingly, the district court did not abuse its discretion in denying in part Karen's motion for protective order.

## C.

*Did Globe have a right to rescind the Policy?*  Karen waived Greg's physician-patient privilege by signing the Authorization for Release, entitling Globe to Greg's medical records. We now consider whether Globe could rescind the Policy based on what it learned from those records.

Globe rescinded the Policy under Ohio Revised Code § 3911.06.  That statute provides:

> No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer.

It allows an insurer to void a policy if an applicant has made material misrepresentations in the insurance application.  *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 821 (6th Cir. 2015).  To that end, the insurer must "clearly prove": (1) the applicant gave a willfully false answer in the insurance application, (2) the applicant made such answer fraudulently, (3) but for the false answer, the insurer would not have issued the policy, and (4) the insurer did not know that the answer was false. *Jenkins v. Metro. Life Ins. Co.*, 173 N.E.2d 122, 125 (Ohio 1961).

Assuming an insurer can prove an applicant gave a material and objectively false answer, the law presumes she did so willfully and fraudulently.  *See Lyttle v. Pac. Mut. Life Ins. Co. of Cal.*, 72 F.2d 140, 142 (6th Cir. 1934) (interpreting the predecessor statute to § 3911.06).  This means an insurer seeking relief under § 3911.06 is not required to prove fraudulent intent. *Ramsey*, 787 F.3d at 821 (citation omitted).  The applicant can rebut the presumption by providing some evidence "to indicate that [she] made an honest mistake." *Jenkins*, 173 N.E.2d at 126.

Globe argues that Karen gave objectively false answers to questions 2(a) and 2(b) in the Policy's application by failing to disclose Greg's history of liver function abnormality and depression.  We consider Karen's "no" answers to the interrogatories at issue in turn.  Because we decide these issues in Globe's favor, we need not consider Globe's other arguments.

**1.**

Question 2(a) asked Karen: "In the past 3 years, has [Greg] been diagnosed or treated by a member of the medical profession for . . . [c]ancer, coronary artery disease, or any disease or disorder of the heart, brain, or liver?" Karen answered "no." She also signed the application on January 10, 2018, so the relevant three-year period dates to January 10, 2015. This means Globe must show that a medical professional "diagnosed or treated" Greg for an enumerated "disease" or "disorder" during that timeframe. Globe argues that Karen's answer to question 2(a) was objectively false because Greg had, during the relevant period, been diagnosed with and treated for liver function abnormality.

This requires us to interpret question 2(a), which is a part of the Policy. The point of contract interpretation "is to discover and effectuate the intent of the parties." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996). And courts presume that the intent of the parties resides "in the language they chose to use in their agreement." *Id.* Courts should, moreover, "honor the plain meaning of the policy's language unless another meaning is clearly apparent from the contents of the policy." *Ohio N. Univ. v. Charles Constr. Servs., Inc.*, 120 N.E.3d 762, 766 (Ohio 2018) (internal quotation marks omitted). "It is common practice to resort to dictionaries as the best source for establishing the ordinary meaning of contractual terms." *Rite Aid of Ohio, Inc. v. Marc's Variety Store, Inc.*, 638 N.E.2d 1056, 1061 (Ohio Ct. App. 1994). Ultimately, the goal is to determine "not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 334 (Ohio 2001) (emphasis and quotation omitted).

Start with the definitions of "diagnosed" and "treated"—both actions that question 2(a) says must be done by a medical professional. Oxford English Dictionary defines "diagnose" as "[t]o make a diagnosis of (a disease), to distinguish and determine its nature from its symptoms;

to recognize and identify by careful observation."[5]  It defines "treat" as "[t]o deal with or operate upon (a disease or affection, a part of the body, or a person) in order to relieve or cure."[6]

Next consider the definitions of "disease" and "disorder"—both ailments of the insured that, if diagnosed or treated in the past three years, an applicant must report.  Oxford defines "disease" as a "[s]ickness (in a person, animal, or plant)."[7]  Oxford defines "disorder" as a "[d]isturbance of the function, and sometimes the structure, of the body, a part or system of the body, or the mind[,]" or "an illness or condition that disrupts normal physical or mental functions."[8]

**a.**

Karen's "no" answer to question 2(a) was objectively false.  Dr. Budke, Greg's physician, testified that he diagnosed Greg with liver function abnormality in 2015, 2016, and 2017.  And Dr. Budke used an International Classification of Diseases ("ICD") code in Greg's 2015 medical records under the heading "Visit Diagnoses."  "The ICD is a classification system developed collaboratively between the World Health Organization (WHO) and 10 international centers so that the medical terms reported by physicians . . . can be grouped together for statistical purposes."[9]  And medical providers use ICD codes to get reimbursed by insurance companies for the care they provide their patients.[10]  In Greg's 2015 medical records,

---

[5]*Diagnose*, OXFORD ENGLISH DICTIONARY (online ed.) https://www.oed.com/dictionary/diagnose_v?tab=meaning_and_use#6915039 (last visited March 5, 2024).

[6]*Treat*, OXFORD ENGLISH DICTIONARY (online ed.) https://www.oed.com/dictionarytreat_v?tab=meaning_and_use#17737795 (last visited March 5, 2024).

[7]*Disease*, OXFORD ENGLISH DICTIONARY (online ed.) https://www.oed.com/dictionary/disease_n?tab=meaning_and_use#6535961 (last visited March 5, 2024).

[8]*Disorder*, OXFORD ENGLISH DICTIONARY (online ed.) https://www.oed.com/dictionary/disorder_n?tab=meaning_and_use#6602841 (last visited March 5, 2024).

[9]U.S. DEP'T OF HEALTH & HUMAN SERVS. ET AL., INTERNATIONAL CLASSIFICATION OF DISEASES 10TH REVISION (ICD-10) 1 (2001), https://www.cdc.gov/nchs/data/dvs/icd10fct.pdf.

[10]Natalie Ficek, *The Consequences for Private Practice Physicians After Transitioning from ICD-9 to ICD-10*, 19 DEPAUL J. HEALTH CARE L. 1, 2 (2017).

Dr. Budke listed ICD code 573.9—the "medical code for the disorder of the liver."[11]   R. 51, PageID 1388–89.  Dr. Budke also treated Greg for his liver function abnormality, as he cared for this condition medically through periodic liver function tests and by directing Greg to reduce his alcohol consumption.  At a minimum, liver function abnormality is a "disorder" of the liver.  Dr. Budke classified it as such, medical records from the relevant timeframe show that Greg had elevated liver enzymes, and information that Globe's underwriters consult explains that injury to the liver causes such abnormalities.

Karen argues that liver function abnormality is not a liver "disease" or "disorder."  She points to a 2013 assessment by Dr. Budke[12] that she argues "demonstrates that 'liver function abnormality' is merely shorthand for abnormal liver function test results, which are not themselves a 'disease or disorder' of the liver but rather a possible symptom of a liver disease or disorder."  D. 23 at p.42.  Although liver function abnormality might be a symptom of another disease, as Dr. Budke acknowledges, it is also a condition, according to ICD 573.9, recognized as a disorder of the liver.

Karen makes two additional arguments on this point.  First, she contends that Globe's "Uninsurable List" does not mention liver function abnormality as a "disease" or "disorder."  And this is evidence, according to Karen, that courts routinely look to when determining whether a life insurance applicant made a false statement.  Second, she points to the initial review of her claim by Globe's claims department.  Because it did not at first believe that Karen should have answered "yes" to question 2(a), she argues her "no" answer was not objectively false.

Both arguments miss the mark.  It is true that Karen cites a portion of Globe's underwriting guidelines that does not list liver function abnormality as a "disease" or "disorder" of the liver.  But Nicholas Danner, Globe's vice president of underwriting and new business, testified that Globe's Uninsurable List is not exhaustive.  Elsewhere, guidelines that Globe's

---

[11]*See also* U.S. DEP'T OF HEALTH & HUM. SERVS., ICD-9-CM TABULAR LIST OF DISEASES (FY12) 399 (2011), https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD9-CM/2011/Dtab12.zip (listing 573.9 as "[u]nspecified disorder of liver").

[12]Under the heading "Assessment" Dr. Budke wrote "Elevated [Liver Function Tests]-no [symptoms] of liver disease."

underwriters use to assess risk discuss "elevated" liver enzymes—including ALT and AST—and explain that "[t]he likelihood of significant liver disease increases with the number and magnitude of liver enzyme abnormalities." R. 67-3, PageID 4585. This information provides further that "injury to the liver" and "cell death" can cause the liver to "release enzymes" into a person's blood, and "[w]hen the liver is injured, abnormal blood serum concentrations of some but not necessarily all of the liver enzymes may occur." *Id.* Even more to the point, Danner testified that under these guidelines, "liver function abnormality" is a "disorder of the liver." R. 73, PageID 5072–74.

Nor does Globe's initial determination about Karen's answer to question 2(a) change the calculus. Globe's denial letter referred only to Karen's "no" answer to questions 2(b) and 3; it said nothing about her answer to question 2(a). But the letter also informed Karen that Globe was not "waiving [its] right to obtain additional medical records or to raise additional grounds for recission at a later date and to use any information contained in these records to defend [its] position." R. 67-3, PageID 4540.

**b.**

Because Globe has shown Karen's "no" answer to question 2(a) was objectively false, given Greg's liver function abnormality, the law presumes Karen answered that question willfully and fraudulently. *See Lyttle*, 72 F.2d at 142. Karen can rebut this presumption by providing some evidence "to indicate that [she] made an honest mistake." *Jenkins*, 173 N.E.2d at 126.

Karen's evidence does not show that she made an honest mistake about Greg's liver disorder. Ample record evidence demonstrates that Karen knew Greg had been diagnosed with or treated for liver function abnormality. Karen went to "virtually every one of [Greg's] medical appointments." R. 50, PageID 846. Although we do not know what was discussed at these visits, we do know that many of the records documenting these visits include Dr. Budke's diagnosis of Greg's liver function abnormality. And Karen testified that she checked her husband's online lab results anytime "he had lab work" done. *Id.* at 815. These lab results would include the results of Greg's elevated liver enzymes.

Karen also spoke with Dr. Budke's office about Greg's liver function abnormality on multiple occasions.  Greg's records indicate that Dr. Budke's office spoke with Karen over the phone in July 2015 and gave her the results of Greg's latest tests.  Dr. Budke's notes about those results indicate that Greg's "[l]abs show some improvement in liver function elevation.  Otherwise look OK.  Need to continue to work on reducing alcohol intake."  R. 50-10, PageID 1217.  And in January 2017, an employee again spoke with Karen over the phone and gave her Greg's liver function test results.  Dr. Budke's notes say that Greg's "[l]abs show that his liver tests are elevated again.  Other labs look OK."  R. 51-8, PageID 1679.

Despite this, Karen argues that "no evidence" exists that she was ever informed that her husband had been diagnosed or treated for a liver disease or disorder.  We disagree.  Diagnosis aside, Dr. Budke's periodic liver function tests and advice to drink less fit the plain meaning of "treat" as the tests and advice dealt with Greg's liver to "relieve or cure."  And this is a meaning that an "ordinary reader" of question 2(a) "would have understood."  *See Andersen*, 757 N.E.2d at 334 (emphasis omitted).  An ordinary reader would also understand that "disorder" means "an illness or condition that disrupts normal physical or mental functions."  All in all, Karen knew that Dr. Budke was treating Greg for a liver disease or disorder.  *Cf. Sambles v. Metro. Life Ins. Co.*, 108 N.E.2d 321, 324 (Ohio 1952) (finding it unreasonable to infer that an insured patient did not know he was being treated for a serious ailment where evidence showed he visited his physician before and after applying for life insurance).

Karen testified that she could not recall her conversations with Dr. Budke or his office about Greg's elevated liver function tests.  Still, when presented with records of one of those conversations, she conceded that the records said it happened.  Karen has failed to create a triable issue about whether she spoke with Dr. Budke's office.  Karen's testimony that she could not remember these conversations does not directly refute Globe's evidence that they occurred.  *Cf. Wysong v. City of Heath*, 260 F. App'x 848, 857 (6th Cir. 2008) (finding summary judgment appropriate when plaintiff "admitted in his deposition that he [did] not deny" fighting with officers, but only claimed that "he [did] not remember what happened").

At bottom, Globe presented evidence that Karen's "no" answer to question 2(a) was objectively false considering Greg's liver disorder.  And Karen has not provided any independent

facts to support her arguments that she made an honest mistake and really believed her husband was not treated for this condition.  Globe therefore has clearly established that Karen willfully and fraudulently answered question 2(a).

**2.**

Question 2(b) asked Karen: "In the past 3 years, has [Greg] been diagnosed or treated by a member of the medical profession for . . . [a] mental or nervous disorder . . . ."  Again, Karen answered "no."  Globe argues that Karen's answer to question 2(b) was objectively false because Greg had, during the relevant three years, been diagnosed with and treated for depression.  Karen disagrees.  And she argues that even if her answer to question 2(b) was objectively false given Greg's depression, she made an honest mistake when she told Globe her husband did not have a mental or nervous disorder.

**a.**

Karen's "no" answer to question 2(b) was objectively false with respect to Greg's depression.  Around 2016, Karen "had conversations with Dr. Budke about" the medication Greg took for his depression.  And Greg's medical records demonstrate that doctors diagnosed him with depressive disorder and prescribed Cymbalta.  We have opined that depression is a "mental disorder." *Buxton v. Halter*, 246 F.3d 762, 763 n.1 (6th Cir. 2001) (citing the Social Security Administration's "Listing of Impairments" at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (12.04)).  So has the U.S. Department of Health and Human Services.[13]  And Globe's underwriting guidelines classify depression as a "Mental/Nervous Disorder." R. 67-3, PageID 4542.

The only argument Karen has in response is one we have already rejected.  She points to Globe's denial letter that did not include depression as a reason it believed Karen falsely answered question 2(b).  Even so, Globe expressly informed Karen that it was not waiving its right to raise additional reasons for denying her claim.

---

[13]*Mental Health and Mental Disorders*, U.S. DEP'T HEALTH & HUM. SERVS. https://health.gov/healthypeople/objectives-and-data/browse-objectives/mental-health-and-mental-disorders (last accessed Jan. 6, 2024) ("Mental disorders like depression and anxiety can affect people's ability to take part in healthy behaviors.").

**b.**

Karen cannot show that she honestly believed depression was not a mental disorder. At one point, Karen testified that she did not know whether depression was a mental disorder. But when asked if she remembered discussions about her "husband's mental condition, whether he was depressed," she responded "[y]es." R. 50, PageID 837. She argues that this is not proof that she understood depression to be a mental disorder when she submitted the Policy application. Yet the law expects Karen to understand the Policy as the "ordinary reader" would. *See Andersen*, 757 N.E.2d at 334 (quotation omitted). With no other evidence that she did not honestly believe depression was a mental disorder, Karen has failed to rebut the presumption that she answered question 2(b) willfully and fraudulently. *See Jenkins*, 173 N.E.2d at 126.

**3.**

We must now consider whether Globe would have issued the Policy, but for Karen's "no" answers to questions 2(a) and 2(b). Globe issued Greg its "Sub-Standard A" policy based on Karen's application and the underwriting call. Danner declared that had Karen answered questions 2(a) and 2(b) honestly, Globe would have issued Greg a different policy or no policy at all.

Is it enough that Globe would have issued Greg a different policy rather than no policy at all? Ohio law seems to answer this question in the affirmative. An insurer cannot refuse a claim under a policy based on an applicant's answer to an interrogatory unless the answer "induced the company to issue *the* policy" and "but for such answer *the* policy would not have been issued." Ohio Rev. Code Ann. § 3911.06 (emphasis added). *Jenkins* held that an insurer can prove its defense under § 3911.06 by clearly showing that, but for an applicant's answers, "*the* policy would not have been issued." 173 N.E.2d at 125 (emphasis added). Ohio's lower courts agree. *Nationwide Ins. Enter. v. Progressive Specialty Ins. Co.*, No. 01AP-1223, 2002 WL 1338791, at *5 (Ohio Ct. App. June 20, 2002) (finding that a party could not "demonstrate that Progressive would have issued the same policy with the same terms and conditions if it had known of the allegedly fraudulent answer prior to issuing the policy"); *Martin v. Atlanta Life Ins. Co.*, No. 75AP-163, 1975 WL 181648, at *3 (Ohio Ct. App. Aug. 7, 1975) (describing the test in *Jenkins*

as "whether a reasonably prudent underwriter would have, had the fact misrepresented been communicated at the time of effecting the insurance, rejected the risk or charged an increased premium").  Therefore, we conclude that Globe need demonstrate only that it would not have issued Greg the same Sub-Standard A policy had Karen provided honest answers.

But for Karen's false application answers, Globe would not have issued Greg the same policy.  As a reminder, Karen answered "yes" to question 3—that Greg had a "chronic illness or condition which requires periodic medical care."  Danner stated that this answer required Globe to apply "100 debits" to Greg's application and issue him a "Sub-Standard A policy in lieu of the Standard Policy."  R. 67-1, PageID 4153–54.  He said further that even if Globe ignored Greg's other ailments, had Karen disclosed Greg's "depression, the starting point would have been a Sub-Standard A policy, with the disclosure of the disability moving the classification to a Sub-Standard B policy, rather than the Sub-Standard A policy that actually issued."  *Id.* at 4154.  What is more, "premiums for policies assigned to Sub-Standard B are higher than policies assigned to Sub-Standard A."  *Id.* at 4144.

Karen points to evidence that Globe may have issued Greg the same Sub-Standard A policy even if she disclosed his depression.  Indeed, portions of Globe's guidelines seem to contradict the math Danner apparently used to conclude that Globe would have issued Greg a Sub-Standard B policy if the company knew about his disability and his depression.  But Danner also indicated that Globe's use of "debit points is discretionary" and that they are "not rigidly applied."  *Id.* at 4147.  Danner further explained that Globe's underwriters also pose "follow-on questions" to the applicant to assess risk.  *Id.* at 4145–46.

Globe did that here.  According to Danner, if Karen had disclosed Greg's liver function abnormality and depression, Globe would have asked her a litany of follow-up questions.  Assuming Karen answered the follow-up questions truthfully, the record demonstrates what those answers should have included.  For example, if Karen disclosed either Greg's depression or liver disorder, Globe would have asked additional questions about Greg's alcohol use.  Globe's guidelines provide that "an application for a proposed insured abusing alcohol while also taking Mental Nervous drugs, such as for depression, needs to be rejected."  *Id.* at 4156.  Danner stated that Globe would have considered Greg's undisputed alcohol consumption as "alcohol abuse."

*Id.* at 4162–63.  It is also undisputed that Greg took Cymbalta, a "Mental Nervous" drug, during the relevant three-year period.  So according to Danner, Globe would have rejected Karen's application outright.

Karen next argues that the Policy and Ohio law prohibit Globe from using Karen's answers to follow-up questions in its defense.  But Globe did not use Karen's answers to follow-up questions in its defense.  It used Karen's "no" answers to questions 2(a) and 2(b) to show how her nondisclosures impeded its underwriting process.  Globe therefore has shown that those nondisclosures were material to its risk evaluation.

With all this in mind, Globe has provided evidence that it would have, at minimum, issued her a different policy but for Karen's nondisclosures in her application.  And Karen has not produced evidence to genuinely dispute these facts.

**4.**

Did Globe have knowledge of Greg's ailments when Karen completed the Policy application? No.  And Karen does not argue otherwise.

\*          \*          \*

In sum, Globe has clearly demonstrated it is entitled to rescind the Policy under § 3911.06.  This is the only conclusion that a reasonable factfinder could reach.  Globe's defense therefore bars Karen's breach-of-contract and bad-faith claims.  *See Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994).

**D.**

Karen also challenges the district court's order denying her request to redact Greg's medical information from its summary-judgment order.  But in both her principal and reply briefs, Karen provides no support for her argument beyond claiming that she did not waive Greg's statutory right to privacy based on her earlier arguments.  As a result, we agree with Globe that we do not need to consider this argument. Fed. R. App. P. 28(a)(8)(A); *United States v. Meda*, 812 F.3d 502, 519 (6th Cir. 2015) ("No citation was provided to support this proposition.  Thus, it need not be addressed."); *Shane Grp., Inc. v. Blue Cross Blue Shield of*

*Mich.*, 825 F.3d 299, 306 (6th Cir. 2016) (describing the grounds for sealing documents as so perfunctory "that [they] could have been summarily rejected" (quotation omitted)).

## III.

For these reasons, we **AFFIRM** the district court's judgment.